**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| JASON GOODWIN,<br>　　　Plaintiff,<br><br>　　　v.<br><br>UTGR, INC., D/B/A BALLY'S TWIN<br>RIVER LINCOLN CASINO RESORT,<br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 1:22-cv-330-JJM-LDA

**MEMORANDUM AND ORDER**

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Jason Goodwin has alleged discrimination, retaliation, and constructive discharge under Title VII based on sexual orientation during his employment with Bally's Twin River Lincoln Casino Resort ("Twin River"). He also alleges violations of the Rhode Island Fair Employment Practices Act ("FEPA"), the Rhode Island Civil Rights Act ("RICRA"), and the Rhode Island Whistleblower's Protection Act ("WPA"). ECF No. 1. Following discovery, Twin River moved for summary judgment. ECF No. 12. For the reasons below, the Court GRANTS Twin River's motion on all counts alleging disparate treatment, retaliation, and constructive discharge but DENIES the motion as to the count alleging hostile work environment.

## I.    BACKGROUND

### A. Incidents With James Hopkins

Mr. Goodwin was a table games dealer at Twin River for eight years until he ultimately resigned from the position in August 2022. During his time at Twin River,

1

Mr. Goodwin had an acrimonious relationship with his co-worker, James Hopkins—a table games floor supervisor. The tension between the co-workers began on November 30, 2019, when Mr. Goodwin discovered that someone damaged his car's windshield wiper in the process of placing a note underneath that stated, "[w]hy do you always park like an asshole, you pussy momma's boy?"[1] ECF No. 1-2 at 2, ¶ 10. After reviewing his car's camera footage, Mr. Goodwin identified Mr. Hopkins as the individual who left the note. ECF No. 16 at 4.

Mr. Goodwin promptly reported this incident to Twin River management via an incident report in which he explicitly stated that he believed Mr. Hopkins' harassment was due to Mr. Goodwin's sexual orientation.[2] ECF No. 13-2. Two days later, Human Resources Manager Alisar Rowan called Mr. Goodwin to inform him that there was nothing Twin River could do regarding the incident. ECF No. 17-5 at 2. Mr. Goodwin then reported the note and damage to Lincoln Police, and an officer contacted Ms. Rowan to gather more information on Mr. Hopkins but Ms. Rowan refused to provide such information without a subpoena. ECF No. 17-6 at 2. Nonetheless, the Lincoln Police officer eventually contacted Mr. Hopkins, who admitted to leaving a note on Mr. Goodwin's car but denied causing any damage. *Id.*

---

[1] Mr. Goodwin discarded the note, and Twin River management was therefore unable to verify its contents. ECF 13-1 at 40-42, 45-46.

[2] Although Mr. Goodwin did not disclose his sexual orientation to Mr. Hopkins, he "came out" as gay to family and friends just a few weeks before this incident and suspected Mr. Hopkins knew of his sexual orientation because Twin River was a "large rumor mill-based facility." ECF 13-1 at 60-61. Mr. Goodwin deduced that the Mr. Hopkin's language in the note was a display of discriminatory animus against Mr. Goodwin's sexual orientation. *Id.* at 60.

at 3. Pursuant to Twin River's investigation of the incident, Mr. Hopkins filed an incident report, stating that he left a "friendly note" under Mr. Goodwin's windshield wiper because Mr. Goodwin's car was parked outside the designated space. ECF No. 13-3 at 2.

About a month later, Mr. Goodwin discovered that someone deliberately parked their car to block entry through the driver's side door. ECF No. 1-2 at 2, ¶ 13. After review of his car's camera recordings, Mr. Goodwin observed that Mr. Hopkins was responsible for the blockage and reported the incident to Ms. Rowan, Human Resources Executive Director Jennifer Reagan, and union official Tara Romano. ECF No. 13-1 at 53-54. In the incident report, Mr. Goodwin stated that Mr. Hopkins continued to harass him by "intimidating" him and "touching and messing" with his car and highlighted that he feared for his safety at work but felt that Twin River had done nothing to help. ECF No. 13-4.

During Twin River's investigation of the incident, Mr. Hopkins filed his own incident report, admitting that he purposely parked closely to the driver's side of Mr. Goodwin's vehicle to give him "some perspective" on how Mr. Goodwin's habit of parking his vehicle in the lane of travel was impacting others. ECF No. 13-5. In response, Twin River management issued a reprimand to James Hopkins, instructing him to "conduct himself in a professional and courteous manner with all employees"

and urging that "any further incidents will result in progressive discipline up to and including termination." ECF No. 13-6.

A few weeks later, Mr. Goodwin emailed Ms. Reagan reporting that Mr. Hopkins was staring him down and that he planned to file a restraining order against Mr. Hopkins because he was in fear of his safety and felt that Twin River management was not taking any disciplinary action against Mr. Hopkins for his behavior. ECF No. 17-14. Mr. Goodwin followed through with his plan and obtained a harassment prevention order, instructing Mr. Hopkins not to harass, harm or contact Mr. Goodwin and to remain at least 2 yards away from Mr. Goodwin. ECF No. 17-16. Upon Mr. Goodwin apprising Ms. Reagan about the order, she informed Executive Director of Table Games Kevin Brown about it, who in turn replied that no contact should mean "[n]o conversation" and that if Mr. Hopkins were ever supervising Mr. Goodwin, they would "make a change" for the few hours it impacted. ECF No. 17-17.

Nonetheless, Mr. Hopkins violated the harassment prevention order, entering Mr. Goodwin's poker pit, staring at, and walking by him and standing at a desk computer behind Mr. Goodwin—all which occurred within six feet of Mr. Goodwin. Mr. Goodwin perceived these acts as an attempt to intimidate him and called a table manager over to make her aware of the situation and request for her to move either him or Mr. Hopkins out of the area. However, after consulting management, the table manager ultimately informed Mr. Goodwin that there was nothing she could do. When Mr. Goodwin asked to leave his table to report the incident to an officer, the

4

table manager refused and stated, "if this affects you so seriously, you should probably find another job." She then warned that if Mr. Goodwin left his poker table, she would have him terminated for job abandonment. In an incident report reciting this incident, Mr. Goodwin stated he was in constant fear for his safety at work, described Mr. Hopkins as a "threat" and asserted that the "house" was condoning Mr. Hopkins' behavior by neither disciplining him nor enforcing the harassment prevention order. ECF No. 17-18 at 2; ECF No. 13-1 at 69-71.

Shortly after this incident, Mr. Goodwin obtained an extension on his harassment prevention order against Mr. Hopkins, which increased the order's duration to a year, and required Mr. Hopkins to stay at least 10 yards away from Mr. Goodwin. ECF No. 13-9. Nonetheless, a month after obtaining the modified order, Mr. Goodwin emailed Mr. Reagan to report that Mr. Hopkins violated the restraining order once again by "flooring" in Mr. Goodwin's pit and walking within 5 feet of his gaming table several times. ECF No. 13-10 at 2. He stated that, during this incident, Mr. Hopkins looked to see if Mr. Goodwin was in the gaming pit and deliberately entered the pit despite both him and Twin River management being aware he was not supposed to be near Mr. Goodwin. ECF No. 13-1 at 84.

In another incident, Mr. Hopkins entered a break room while Mr. Goodwin was present and seated directly beside a coat rack. ECF No. 13-12. Mr. Hopkins hung his coat on that coat rack and promptly exited the room. *Id.* Mr. Goodwin reported the incident to Ms. Rowan, Table Games Manager Kimberly Marafitte, and Lincoln Police Department as constituting a violation of the harassment prevention order.

ECF No. 1-2 at 2, ¶ 18; ECF No. 13-12 at 2.  Lincoln Police Department declined to file charges against Mr. Hopkins, after concluding that Mr. Hopkins contact with Mr. Goodwin was not intentional.  ECF No. 13-12 at 2.

A few months later, Mr. Goodwin filed a discrimination charge against Twin River at the Rhode Island Commission for Human Rights, claiming a "hostile pattern of ongoing harassment" from Mr. Hopkins against him based on his sexual orientation.  ECF No. 13-15 at 1, 3.  In the charge, Mr. Goodwin highlighted that despite the multiple incident and police reports he filed regarding Mr. Hopkins' behavior, Twin River Human Resources refused to protect him or take any corrective action, thus perpetuating a hostile work environment.  *Id.* at 4.  Further, Mr. Goodwin attested that because of Mr. Hopkin's harassment, he was in constant fear of his life and had to seek medical attention for "physical and mental health issues." *Id.*

## B. Incidents With Other Personnel

In March 2021, Louis Pear, a co-worker of Mr. Goodwin, served as a witness for an incident report, reporting that he overheard union representative Leigh Gilbert[3] call Mr. Goodwin a "faggot" and said he "knew where he and his kids lived." ECF No. 13-13.  Shortly after that incident, Mr. Goodwin requested that his union dues not be withheld from his paycheck despite knowing that Local 711 could still

---

[3] Mr. Gilbert worked for the Local 711 union, not Twin River, and was responsible for campaigning on the union's behalf on Twin River's property.  ECF No. 13-1 at 95.

seek to collect those dues. Human Resources promptly approved his request. ECF No. 13-1 at 97.

In December 2021, John Flanagan, a Twin River employee, was acting in his capacity as a union representative when he accompanied Mr. Goodwin to a meeting with Human Resources about potential discipline. On the way to the meeting Mr. Flanagan told Mr. Goodwin "Now when we go up there, none of that gay shit." ECF No. 17-11 at ¶ 12-13. At the meeting, Mr. Goodwin argued against having Mr. Flanagan being present as his union representative, alleging that he previously doxed and harassed Mr. Goodwin. *Id.* ¶ 14. But Twin River management neither permitted Mr. Goodwin to leave the meeting nor have another union representative represent him. *Id.*

### C. Incidents Leading Up to Resignation

Due to Mr. Goodwin's decision not to pay union dues, he was eventually suspended from Twin River in early 2022 and did not return to work until July 2022, when he finally paid his dues. ECF No. 13-1 at 32, 99. In the period after his return from suspension, Mr. Goodwin stated Mr. Hopkins came into his table games area two times—though at this point the harassment prevention order was expired. ECF No. 13-1 at 75-76. On the first occasion, Mr. Hopkins had only game-related communications with Mr. Goodwin. ECF No. 13-1 at 79. However, within two feet of Mr. Goodwin, Mr. Hopkins spoke with others about owning and shooting guns, such as an AR-15. ECF No. 13-1 at 79-81. On the second occasion of contact, Mr.

Hopkins referred to Mr. Goodwin as his "buddy" to a patron to which Mr. Goodwin quickly refuted and advised Mr. Hopkins not to speak to him. No. 13-1 at 81-82

Just a mere two weeks after returning to work, Mr. Goodwin resigned from Twin River in August 2022. ECF No. 1-2 at 3, ¶ 27. Mr. Goodwin attested that he resigned because he "couldn't take the pressure that was mounting . . . the depression and . . . the same four walls and the same management and the same just general harassment." ECF No. 13-1 at 102. He also expressed that the pressure was "building up and . . . wasn't good for my mental health." *Id.* Mr. Goodwin explained that the feelings of pressure and harassment would arise every time he would meet with management and that he felt particularly pressured when a table games manager stated that he wanted to meet with Mr. Goodwin to discuss his yearly review. ECF No. 13-1 at 102-103.

## II.    STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the boilerplate of the pleadings." *Quinn v. City of Bos.*, 325 F.3d 18, 28 (1st Cir. 2003). Taking the evidence in the light most favorable to the nonmoving party, the Court must grant summary judgment if the moving party can show that "no genuine dispute as to any material fact," and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" if a reasonable jury could resolve it for the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Additionally, the moving party must have a right to judgment as a matter of law, which can be established if the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is a "drastic remedy" because it deprives the parties of their Seventh Amendment right to have their case tried by a jury. *Colman v. Faucher*, 128 F. Supp. 3d 487, 490 (D.R.I. 2015). It also serves as an important check on the parties: the nonmovant may not rely on "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation," but must produce "specific facts" to support their claims or defenses. *Theidon v. Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020) (citations and internal quotation marks omitted).

## III.   DISCUSSION

Mr. Goodwin has four claims: (1) discriminatory terms and conditions of employment under FEFA, Title VII, RICRA, and WPA; (2) constructive discharge under FEPA and Title VII; (3) hostile work environment; and (4) retaliation under FEPA and Title VII. ECF No. 1.

### A. Counts I and II: Discrimination

Mr. Goodwin's claims essentially assert discrimination, which—in absence of direct evidence of discrimination—requires this Court to apply the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff bears the burden to show a prima facie case of discrimination by showing that (1) they are a member of a protected class; (2) they

were qualified for the position; (3) they suffered an adverse employment action; and (4) someone with comparable or inferior qualifications was hired or retained. *Ahmed v. Johnson*, 752 F.3d 490, 496 (1st Cir. 2014); see *also McDonnell Douglas Corp*, 411 U.S. at 802. Once the plaintiff has established an inference of discrimination, the burden of production shifts to the defendant to show that there is a legitimate, nondiscriminatory reason for the action. *Ahmed*, 752 F.3d at 496. If the defendant can articulate a reason, the inference disappears, and the burden shifts back to the plaintiff to show "by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason . . . is discriminatory." *Id.* (citation omitted). Pretext requires a two-part showing: first, that the articulated reason is pretextual, and second, that the true reason is discriminatory. *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 693 F.3d 31, 35 (1st Cir. 2012) (citations omitted).

## I. Adverse Employment Action and Constructive Discharge

This Court will first address the third element of the prima facie case for discrimination under *McDonnell Douglas* because it is also relevant to Mr. Goodwin's constructive discharge claims under Title VII and FEPA. An employment action is adverse if it "'affect[s] employment or alter[s] the conditions of the workplace[.]'" *Stratton v. Bentley Univ.*, 113 F.4th 25, 38 (1st Cir. 2024) (quoting *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010)). An employee's resignation may constitute an adverse employment action by constructive discharge only when his working conditions were so intolerable that a reasonable person "would have felt compelled to resign." *Id.* at 39 (quoting *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28

10

(1st Cir. 2002)).  The constructive discharge standard is an objective one, meaning that an employee's subjective beliefs, no matter how sincere, do not govern.  *Id.* (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 25 (1st Cir. 2013)).  Thus, "it is not enough that a plaintiff suffered 'the ordinary slings and arrows that workers routinely encounter in a hard, cold world.'"  *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)) (internal quotations omitted).

If, after such intolerable treatment, "a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged." *Harris v. City of Providence*, 588 F. Supp. 3d 211, 217 (D.R.I. 2022) (quoting *Landrau-Romero v. Banco Popular De P.R.*, 212 F.3d 607, 613 (1st Cir. 2000)).  A six-to-seven-month period between the last harassment or discrimination incident an employee experienced, and the employee's ultimate resignation has been found as too long to support a constructive discharge claim.  *See Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (six months); *see also Landrau-Romero*, 212 F.3d at 613 (seven months).

Mr. Goodwin alleges that he was constructively discharged because his workplace was intolerable because of illegal discrimination and retaliation.  ECF No. 1-2 at 3, ¶ 27.  Twin River contends that Mr. Goodwin's was not constructively discharged because his resignation was too remote from the alleged instances of discrimination and harassment.  ECF No. 12-1 at 14-15.  A review of the record reveals an unclear timeline of what harassment incidents occurred proximately to

Mr. Goodwin's resignation.   In early-2022, Mr. Goodwin was laid off due to nonpayment of dues and he did not return to work until months later around July 2022.   Then Mr. Goodwin resigned about two weeks after he returned to work.   In Mr. Goodwin's deposition, he testified that two incidents with Mr. Hopkins occurred within his last couple months of employment: (1) Mr. Hopkins spoke with others—within two feet of Mr. Goodwin—about owning and shooting guns, such as an AR-15; and (2) Mr. Hopkins referred to Mr. Goodwin as his "buddy" to a patron to which Mr. Goodwin quickly refuted and advised Mr. Hopkins not to speak to him.   ECF No. 13-1 at 79-82.[4]   In his Opposition to Motion for Summary Judgment, Mr. Goodwin suggests that these two incidents occurred within the two weeks before his resignation.   ECF No. 16 at 25.   Twin River disputes Mr. Goodwin's timeline, alleging that he is attempting to "shoehorn" Mr. Hopkins' harassing conduct into the period of "the last few months of employment," despite Mr. Goodwin not working at Twin River for "four to six months" before his two-week return.   ECF No. 18 at 7-9.

Under summary judgment, this Court will resolve the doubts regarding the timeline of the two incidents in Mr. Goodwin's favor and accept that they occurred in his final two weeks at Twin River.   As to those incidents, Mr. Goodwin highlights Mr. Hopkins' gun conversation as one that a reasonable person would find alarming, noting that if Mr. Hopkins felt comfortable having such a conversation so close to

---

[4] Mr. Goodwin notes that Mr. Hopkins was acting as his table games supervisor during this incident.   ECF No. 17 at 9, ¶ 125.   However, by Mr. Goodwin's own admission, Mr. Hopkins role as table games supervisor gave him no authority to discipline or take any adverse employment action against Mr. Goodwin.   ECF No. 13-1 at 89.

him—an enemy—then he could expect that matters would escalate from there. ECF No. 16 at 25. While Mr. Goodwin may well sincerely believe that Mr. Hopkins was attempting to harass him when having that gun conversation with another co-worker two feet away from him, his subjective beliefs do not govern the constructive discharge test. Rather, the relevant inquiry is whether this incident is evidence of working conditions so intolerable that a *reasonable person* would feel compelled to resign.

At most, Mr. Hopkins' gun remarks were insensitive to make around a co-worker with whom he had a contentious relationship. But "insensitive, unfair, or unreasonable" remarks, even if aimed toward Mr. Goodwin, are not enough to show the existence of an objectively intolerable workplace from which he felt compelled to resign. *Stratton*, 113 F.4th at 39 (quoting *Ahern v. Shinseki*, 629 F.3d 49, 59 (1st Cir. 2010)). The same analysis applies to the second incident in which Mr. Hopkins called Mr. Goodwin "buddy," which at most can be seen as "insensitive" considering the two co-workers' sour history but does not demonstrate an objective intolerable workplace for the purposes of constructive discharge. *Id.*

Mr. Goodwin also points to incidents involving Mr. Hopkins, Mr. Flanagan, and Mr. Gilbert—which occurred well before his final two weeks at Twin River—as evidence supporting his constructive discharge claim. He references Mr. Hopkins conduct from 2019 to late 2020, including: (1) the homophobic note, (2) Mr. Hopkins' blocking of Mr. Goodwins car, and (3) Mr. Hopkins' multiple violations of the harassment prevention order. ECF No. 16 at 23-24. He also highlights Mr.

Flanagan's homophobic remarks toward him in December 2021 and Mr. Gilbert calling him a homophobic slur in March 2021. *Id.* at 24-25. Even if this Court found that these incidents were enough to prove an objectively intolerable workplace, they are not enough to support Mr. Goodwin's constructive discharge claim because they all occurred more than six months before his ultimate resignation in August 2022. *Harris*, 588 F. Supp. 3d at 217. Accordingly, the timing of Mr. Goodwin's resignation falls outside a reasonable period after theses alleged incidents of harassment, and thus he cannot be deemed to have been constructively discharged. *Id.*

Because Mr. Goodwin has neither provided sufficient evidence of constructive discharge nor identified any other basis for an adverse employment action, Mr. Goodwin cannot make a prima facie case for discrimination under *McDonnell Douglas*. Accordingly, this Court GRANTS Twin River's Motion for Summary Judgment on all counts relating to discrimination (Counts I, II, and VIII).

### B. Constructive Discharge

Because this Court has already found that the evidence does not rise to the level of constructive discharge in its discrimination analysis, Mr. Goodwin's independent claims for constructive discharge under Title VII and FEPA fails as well and the Court GRANTS Twin River's Motion for Summary Judgment on Counts V and VI.

### C. Hostile Work Environment

A plaintiff may establish a Title VII violation upon showing that "an employer required [her] to work in a hostile or abusive environment." *Carvalho v. Santander*

14

*Bank, N.A.*, 573 F. Supp. 3d 632, 641 (D.R.I. 2021) (alteration in original) (quoting *Franchina v. City of Providence*, 881 F.3d 32, 45 (1st Cir. 2018)).  To sustain a claim for hostile work environment, a plaintiff must show that: (1) they are a member of a protected class; (2) who was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment; (5) the  conduct was both objectively and subjectively offensive, such that "a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so"; and  (6) a basis has been established for employer liability.  *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001) (citation omitted).  Specifically, they must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult."  *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "[M]ere offensive utterance[s]" seldom constitute a hostile work environment under a Title VII claim. *Harris*, 510 U.S. at 23.

Mr. Goodwin contends that he was subject to harassment and discrimination in the workplace based on his sexual orientation, creating a hostile work environment.  Like he did for his constructive discharge claim, Mr. Goodwin points to (1) Mr. Hopkins' homophobic note, (2) Mr. Hopkins' blocking of Mr. Goodwins car, (3) Mr. Hopkins' multiple violations of the harassment prevention order, (4) Mr. Gilbert threatening and calling Mr. Goodwin a homophobic slur, and (5) Mr. Flanagan's homophobic remarks as creating a hostile work environment.  ECF No. 16

at 23-25. Twin River contends that there was no sexually hostile work environment because (1) there was no evidence that Mr. Goodwin's sexual orientation was ever specifically addressed or referenced by anyone employed at Twin River, (2) Mr. Hopkins lacked supervisory authority over Mr. Goodwin, and (3) the conflicts between Mr. Goodwin and co-workers were isolated incidents unrelated to his sexual orientation and attenuated from Mr. Goodwin's ultimate resignation. ECF No. 12-1 at 18.

Mr. Goodwin meets the first three elements of hostile work environment—he is a member of a protected class[5], he considered the multiple derogatory remarks regarding his sexual orientation unwelcome, and the harassment was based on his sexual orientation.

The fourth and fifth elements of hostile environment cases are ordinarily the most important. *O'Rourke*, 235 F.3d at 728. Generally, the jury must determine those elements based on "the record as a whole and the totality of the circumstances." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986)). Subject to some policing by this Court, it is generally up to the jury to decide "whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Gerald*, 707 F.3d 7, 19 (quoting *Marrero,* 304 F.3d at 19). There is no bright-line test for this determination, but

---

[5] First Circuit and the Supreme Court precedent establishes that discrimination based on sexual orientation is actionable as a form of sex discrimination under Title VII. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660-61 (2020); *Franchina v. City of Providence*, 881 F.3d 32, 52-54 (1st Cir. 2018).

several factors should be considered such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *O'Rourke*, 235 F.3d at 729 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

## I.    Element Four: Whether the Harassment is Severe or Pervasive

Here, Mr. Goodwin has presented evidence in which a reasonable jury could conclude that the harassment he experienced was severe or pervasive and altered his employment conditions. The offensive incidents Mr. Goodwin cites to reveals at least pervasive discriminatory harassment because there were three distinct incidents in which three individuals—Mr. Hopkins, Mr. Flanagan, and Mr. Gilbert—directed homophobic animus toward him during his time at Twin River. Those three incidents of harassment during Mr. Goodwin's eight years at Twin River may be sufficient evidence for a jury to find that a sexually hostile work environment exists. *See Gerald*, 707 F.3d at 18 (highlighting that just three acts of harassment during an employee's six years working with her supervisor may, if egregious enough, be sufficient to prove a hostile work environment existed). A reasonable jury may well find being called a "pussy ass momma's boy," a "bitch ass faggot," and being told "none of that gay shit," are incidents that, in the aggregate, show a workplace "permeated with discriminatory intimidation, ridicule, and insult" as to constitute a hostile work environment. *Kosereis*, 331 F.3d at 216.

Additionally, though certain acts Mr. Goodwin points to as discriminatory harassment have no sexual orientation-based connotation, such as Mr. Hopkins blocking Mr. Goodwin's car and repeatedly violating the harassment prevention order, this does not "diminish the force of the evidence indicating [sexual orientation]-based animus." *Rosario v. Dep't of Army*, 607 F.3d 241, 248 (1st Cir. 2010). Rather, non-sexual-orientation-based harassment can also be considered when determining whether a hostile work environment existed. *See id.* (highlighting that non-sex-based conduct are acts that "may be added to the mix in assessing a hostile work environment claim."). Accordingly, a reasonable jury could find that Mr. Hopkins' repeated acts of staring Mr. Goodwin down and intentionally violating the harassment protection order contributed to the creating a hostile work environment. As to altered work conditions, Mr. Goodwin has presented evidence that the harassment he endured made him fear for his safety at the workplace and harmed his mental health. *See* ECF No. 17-9; ECF 17-14. Thus, this Court leaves it to the jury to decide whether the harassment Mr. Goodwin endured was of a kind in which a reasonable person "would have felt that it affected the conditions of [his] employment." *Gerald*, 707 F.3d at 19.

## II.    Element Five: Whether the Harassment was Subjectively and Objectively Offensive Conduct

The next inquiry revolves around whether the harassing conduct Mr. Goodwin experienced was subjectively and objectively offensive. This inquiry requires asking: "would a reasonable person find the conduct hostile and abusive and did the complainant in fact perceive it to be so." *Gerald*, 707 F.3d at 19 (citing *Billings v. Town of Grafton*, 515 F.3d 39, 47 (1st Cir. 2008)). The record reveals adequate evidence of subjective offense, as Mr. Goodwin found Mr. Hopkins' note and repeated harassment, Mr. Gilbert's slur, and Mr. Flanagan's anti-gay remark to constitute animus toward his sexual orientation. Additionally, the fact that the abovementioned conduct involved such disparaging homophobic comments, paired with repeated physical intimidation by Mr. Hopkins is enough to fall within the bounds of what a reasonable person may find offensive. Accordingly, Mr. Goodwin has proffered enough evidence to survive summary judgment on this element.

## III.    Element Six: Twin River's Liability

Mr. Goodwin's final hurdle is to establish a basis for employer liability. The standard for establishing employer liability under a hostile work environment claim depends "on whether the harasser is a supervisor or co-employee of the victim." *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002). There is no dispute that Mr. Flanagan and Mr. Goodwin were co-workers, and that Twin River did not employ Mr. Gilbert. That said, there is some dispute over whether Mr. Hopkins was Mr. Goodwin's supervisor, given that his position title was "table games supervisor." Nonetheless, Mr. Goodwin admits that, despite Mr. Hopkins' position title, he had no

authority to discipline or take any adverse employment action against Mr. Goodwin. Thus, under the hostile work environment claim, Mr. Hopkins is merely Mr. Goodwin's co-worker. *See Noviello v. City of Bos.*, 398 F.3d 76, 97 (1st Cir. 2005) (noting that a shift supervisor was not the plaintiff's "supervisor" in the hostile work environment analysis because they had no authority to "hire, fire, or otherwise dictate the terms and conditions of employment.").

Accordingly, because two of Mr. Goodwin's harassers were his co-workers, he must prove that Twin River "knew or should have known of the . . . harassment yet failed to take prompt and appropriate remedial action" to establish employer liability under his hostile work environment claim. *Crowley*, 303 F.3d at, 401 (quoting *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 261 (1st Cir. 2000)).  In this context, summary judgment for the employer is appropriate only "when there is no genuine dispute of material fact that the employer's investigation 'was [not] so deficient that it would not permit [the employer] to rely on its finding.'"  *Caruso v. Delta Air Lines, Inc.*, 113 F.4th 56, 73 (1st Cir. 2024) (quoting *Forsythe v. Wayfair Inc.*, 27 F.4th 67, 73 (1st Cir. 2022)).

Viewing the evidence is a light most favorable to Mr. Goodwin, the record contains sufficient evidence for a reasonable jury to conclude that Twin River knew or should have known of the harassment Mr. Goodwin endured.  Mr. Goodwin filed incident reports to Twin River regarding Mr. Hopkins' homophobic note, car blocking, and harassment order violations, a co-worker filed an incident report to Twin River regarding Mr. Gilbert calling Mr. Goodwin a homophobic slur, and Mr. Goodwin

complained to Twin River about Mr. Flanagan telling him "None of that gay shit." What is at issue, is whether Twin River took "prompt and appropriate remedial action" regarding these incidents.

Twin River contends that it took prompt and remedial action after receiving Mr. Goodwin's complaint because it (1) investigated the matter involving the homophobic note, (2) disciplined Mr. Hopkins following the car blockage incident and (3) ensured that Mr. Hopkins and Mr. Goodwin remained physically separated. ECF No. 12-1 at 20. Mr. Goodwin asserts that Twin River failed to appropriately respond to his complaints because it glossed over the sexual orientation aspect of his complaint about Mr. Hopkins' note and failed to follow through on investigations of the incidents with the union worker and Mr. Flanagan in which Mr. Goodwin's sexuality was attacked. ECF 16 at 25.

Overall, Mr. Goodwin has presented evidence in which a jury could find that Twin River did not take prompt or appropriate action regarding the harassment toward Mr. Goodwin. It is true that Twin River did give a verbal reprimand to Mr. Hopkins regarding the car blockage incident; but otherwise, the record is scant regarding Twin River's remedial action in response to the other harassment incidents. Twin River did investigate the note incident, but that investigation seemingly did not go any further after Mr. Hopkins filed his incident report stating he merely left a "friendly note" on Mr. Goodwin's car. Nothing in the record reflects what the disposition of the investigation was, other than Mr. Goodwin attesting that Twin River told him that there was nothing it could do regarding the incident. ECF

No. 17-5 at 2. Given that Mr. Goodwin explicitly alleged in his incident report that Mr. Hopkins' note reflected discriminatory harassment based on his sexual orientation, a reasonable jury could conclude that Twin River's anemic investigation of the note, while prompt, was not an appropriate response to such alleged harassment.

Similarly, Twin River investigated the incident in which Mr. Gilbert called Mr. Goodwin a homophobic slur, but there is no indication of how it concluded its investigation or what actions it took to prevent such a conflict from recurring.[6] Lastly, there is no clear evidence that Twin River took *any* action regarding Mr. Goodwin's report of Mr. Flanagan's anti-gay remarks toward him. Rather, it appears Twin River focused its investigation only on Mr. Goodwin's complaint of wrongful suspension, which was contained in the same incident report attesting to Mr. Flanagan's remarks. ECF No. 17-43 at 1-2. Taken together, a reasonable jury could find that Twin River did not adequately investigate Mr. Goodwin's claims of sexual orientation-based harassment and thus did not take "appropriate remedial action" in response to these incidents.

Accordingly, Mr. Goodwin has presented enough evidence such that a reasonable jury could conclude that he was subject to a hostile work environment.

---

[6] While this Court recognizes that Mr. Goodwin's incident with the union representative—a non-employee of Twin River—cannot be a basis for employer liability, the incident is relevant evidence of Twin River's pattern of inaction when investigating Mr. Goodwin's harassment complaints.

For those reasons, this Court DENIES Twin River's Motion for Summary Judgment on Mr. Goodwin's hostile work environment claim (Count VII).

### D. Counts III and IV: Retaliation

Mr. Goodwin brings forth retaliation claims under FEPA, Title VII, and WPA. To succeed on a retaliation claim a plaintiff must prove that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity." [7] *Stratton,* 113 F.4th at 41–42 (quoting *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007)). The Supreme Court has held that this is a "but-for" test. *Carvalho,* 573 F. Supp. 3d at 645 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action.").

The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims, meaning that upon the plaintiff making a prima facie case of retaliation, the burden shifts to the defendant to provide a genuine "non-retaliatory reason for its employment decision." *Stratton*, 113 F.4th at 42 (quoting *Abril-Rivera v. Johnson*, 806 F.3d 599, 608 n.10 (1st Cir. 2015)). If the defendant meets their burden, then the burden shifts back to the plaintiff to prove that the defendant's reason is pretext and "that retaliatory animus was the real motivating factor." *Id.* (quoting *Abril-Rivera*,

---

[7] FEPA, Title VII, and WPA all require the plaintiff to prove the same three elements for their retaliation claim. *McElroy v. Fid. Invs. Institutional Servs. Co.*, 298 F. Supp. 3d 357, 366 (D.R.I. 2018) (FEPA); *Carvalho v. Santander Bank, N.A.*, 573 F. Supp. 3d 632, 645 (D.R.I. 2021) (Title VII); Ryder v. Pearson Educ., Inc., 486 F. Supp. 3d 489, 509 (D.R.I. 2020) (WPA).

806 F.3d at 608 n.10). Pretext may be shown based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," or where the reason is simply "unworthy of credence." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

"An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)). Here, Mr. Goodwin engaged in protected activity when he reported to Twin River that he was the target of illegal discrimination when Mr. Hopkins left the homophobic note on his car. Thus, the first element of the retaliation claim is met here.

Where the parties squabble, relates to the second and third elements of the retaliation claim. Mr. Goodwin argues that an adverse employment action occurred because Twin River tolerated a hostile work environment by failing to take prompt remedial action to redress the discriminatory conduct Mr. Goodwin endured. ECF No 1-2 at 2-3 ¶ 23. Twin River asserts that Mr. Goodwin was not subject to any adverse employment action from his protected activity because he continued to be employed in the same position with the same pay and benefits. ECF No. 12-1 at 23.

The First Circuit recently clarified that the second element of retaliation focuses on whether there was a "materially adverse" action—emphasizing that such action need *not* be directly related to an employee's job. *Stratton*, 113 F.4th at 42.

Rather, an action may be materially adverse if it could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). A plaintiff can prove that a materially adverse action occurred by showing that their employer either created a hostile work environment or intensified a preexisting hostile environment. *Quiles-Quiles v. Henderson,* 439 F.3d 1, 8 (1st Cir. 2006) (citing *Noviello*, 398 F.3d at 89). As concluded above, there is sufficient evidence that Twin River fostered a hostile work environment, and the effect of such environment was enough to dissuade a reasonable worker from making a charge or supporting a charge of discrimination. *Stratton*, at 42. Thus, the second element of the retaliation claim is met here.

The final inquiry is whether there is sufficient evidence for a reasonable jury to infer a causal connection between Mr. Goodwin's protected activity and the hostile work environment that arose subsequently. Mr. Goodwin contends that Twin River tolerated a hostile work environment in retaliation for him reporting Mr. Hopkins and others' discriminatory conduct. But even drawing inferences beneficially to him, Mr. Goodwin he has not proffered enough evidence to make out a jury question on whether his protected reports of discrimination was the "but-for" cause of Twin River's tolerating a hostile work environment. While Twin River's inaction in response to Mr. Goodwin's harassment complaints possibly created a hostile environment, there is no evidence that Twin River made the affirmative decision to take such inaction to retaliate against Mr. Goodwin for making his complaints. Rather, Mr. Goodwin merely speculates that Twin River's inaction was meant to

serve as retaliation for his complaints, and conclusively states that toleration of a hostile work environment constitutes retaliation. ECF No. 1-2 at 2-3, ¶ 22; ECF No. 16 at 25. To defeat summary judgment, Mr. Goodwin cannot rely on "rank speculation" and "conclusory allegations" to support his claims. *Theidon*, 948 F.3d at 494. Thus, without sufficient evidence of causation, Mr. Goodwin cannot make a prima facie case on retaliation. Accordingly, this Court GRANTS Twin River's Motion for Summary Judgment on the retaliation claims (Counts III and IV).

## IV.    CONCLUSION

For the reasons stated, this Court DENIES Twin River's Motion for Summary Judgment (ECF No. 12) on the count relating to hostile work environment (Count VII) and GRANTS Twin River's motion on all counts alleging disparate treatment, retaliation, and constructive discharge (Counts I through VI and VIII).

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

September 30, 2024